## UNITED STATES *v.* McKEE.

## McKEE *v.* UNITED STATES.

In 1864, A. entered into two contracts with the United States to deliver a speci-
fied number of tons "of timothy or prairie hay" at Fort Gibson, and other
points within the Indian Territory, which was then the theatre of hostilities.
Each contract contained this clause: "It is expressly understood by the con-
tracting parties hereto, that sufficient guards and escorts shall be furnished
by the government to protect the contractor while engaged in the fulfilment
of this contract." He cut hay within that Territory; and payments were made
to him for that which he delivered and for that which, with other personal
property, had been destroyed by the enemy. Having been prevented by the
enemy from there cutting all the hay necessary to fulfil his contract, he
sued to recover an amount equal to the profits he would have made had the
contract been fully performed; and he alleged that the United States did
not "furnish sufficient guards and escorts for his protection in the cutting
and delivery of said hay." The United States set up as a counter-claim the
amount paid him for the loss of the hay and his other personal property.
The Court of Claims gave judgment for the claimant, allowing in part the
counter-claim. Both parties appealed here. *Held,* 1. That the contract was
for the sale and delivery of hay, and not for cutting and hauling grass.
2. That the obligation of the United States to A. was not that of an insurer
against any loss he might sustain from hostile forces, but to protect his
person and property while engaged in the effort to perform his contract.
3. That A. was entitled to the full value of the property actually lost by him,
and having been paid therefor, his petition and the counter-claim should be
dismissed.

APPEALS from the Court of Claims.

The facts are stated in the opinion of the court.

*Mr. Assistant-Attorney-General Smith,* for the United States.
*Mr. S. W. Johnston, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

McKee had two separate written contracts with the quarter-
master's department for the delivery of hay during the sum-
mer of 1864. The delivery in the one contract to be at Fort
Gibson, of a part of the hay, and of another part at, or within
seven miles of, that fort, and in the other, at Cabin Creek and
Hudson's Crossing of the Neosho River. The locality was the
Indian country, south of Kansas and west of Arkansas, which
was the theatre of hostilities. Each contract contained the fol-

lowing provision, which is the foundation of plaintiff's claim against the United States now under consideration : —

" It is expressly understood by the contracting parties hereto, that sufficient guards and escorts shall be furnished by the government to protect the contractor while engaged in the fulfilment of this contract."

A large part of the contract was fulfilled by delivery of the hay, and for that McKee was paid. A considerable amount of hay, cut and not delivered, was destroyed by the enemy, and for that he was paid. He lost in wagons, horses, and other personal property, by the attacks of the enemy, over $15,000, and for that he was paid.

In addition to this he claims now, and was allowed by the Court of Claims, as profits on the contract for hay never delivered or even cut, $29,559. From this judgment the United States appeals.

The United States made in the court below a claim of set-off for $34,713 wrongfully paid to McKee for his hay destroyed and abandoned before delivery, and for his property lost and destroyed while used in the operation of making and delivering the hay. Of this the Court of Claims allowed the sum of $12,600, and from this part of the judgment McKee appeals.

The opinion of the majority of the Court of Claims, which we find in the record, goes upon the ground that the soil upon which the hay was to be cut was the property of the United States, and that the contract was in legal effect, on the part of McKee, to do for a specified compensation the work which was necessary to convert the grass of the United States into hay, and for its delivery as required. That this compensation was not for the purchase of the hay from McKee, but for his labor and services expended on the property of the United States. The deduction is made from this proposition, that inasmuch as he was ready and willing at all proper times to render these services and perform the labor, and was prevented by the failure of the United States to give him the necessary protection, he is entitled to recover all that he would have made out of the contract if he had fully performed it.

We do not see on what foundation it is held that the grass

was the property of the United States. The court expressly find, that the whole transaction was in the Indian Territory, south of Kansas and west of Arkansas. We know that this is country set apart for the use of the Cherokee, Choctaw, Chickasaw, and other Indian tribes, by treaties, those tribes having been removed there from other localities. We suppose that the possession and usufruct of this land are in the Indians. But if this were otherwise, and it was surveyed and unsold public land, there is nothing in the contract to show that any importance was attached to this fact.

The contract was for the delivery of so many tons of hay. It was expressly provided that it might be timothy hay or prairie hay. Had the United States any timothy meadows in which these men were to make hay? If they could have bought the hay from another party and delivered it, would they not have fulfilled their contract? It was clearly a contract for the sale and delivery of hay, and not for cutting grass and hauling it into the fort.

What then was the obligation assumed by the government in agreeing to furnish sufficient guards and escorts to protect the contractor while engaged in the fulfilment of the contract?

The literal terms of the agreement would be satisfied by such a guard as would secure his personal safety, and if such a construction had been insisted on by the government from the beginning, it would not be void of force.

The construction which the government has put upon it, namely, that it is an obligation to protect his person and property while engaged in the effort to perform the contract, and that the failure to afford such protection renders the United States responsible for the value of the property actually lost for want of it, and which would include, perhaps, personal injuries, if any had been sustained, seems to us to be the true one. It was all the contractor could reasonably ask. It is doubtful whether the contracting officer had authority to promise so much. But to this extent the accounting officers of the government and the quartermaster-general have ratified and confirmed it.

But we can see nothing in the provision itself, nor in the

other parts of the agreement, nor in the nature of the circumstances under which it was made, to justify the conclusion that the government was bound as an insurer against all loss from hostile forces, not only arising from destruction of property, but from loss of speculative profits on grass that was never cut and hay that was never made or delivered or owned by the contractor, and for work that was never done.

Let us suppose that such had been the prevailing force of the enemy that the soldiers could only hold the fort and do no more, and such the danger outside that the contractor did not dare to cut a ton of hay, could he, by demanding an additional regiment to protect him, and saying I am ready to make the hay if you will keep off the enemy, make a speculative calculation of the profits he would have made if his demand had been complied with, and recover that sum, though he had never done any thing more?

If the United States was bound by the contract to furnish full protection, and if the measure of damages was these profits, the question must be answered in the affirmative.

But, as we have already said, we are of opinion that the true measure of damages was the actual value of the property lost by the contractor; and as the government recognized and acted on this rule, we do not think McKee is entitled to recover for his supposed profits, or that the government should recover of him what it has paid him for these actual losses. The result of these views is, that the judgment of the Court of Claims is reversed, with directions to dismiss both the petition of claimant and the counter-claim of the United States; and it is

*So ordered.*